UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-60386-CIV-ALTONAGA/Strauss

BILL D. ALCIUS, *et al.*,

     Plaintiffs,

v.

JOSHUA GRONTENHUIS, *et al.*,

     Defendants.

_____/

**<u>ORDER</u>**

**THIS CAUSE** came before the Court on Defendants, Joshua Grontenhuis, Ryan Rillo, Bryan Kalish, Daniel McEvoy, Thomas McGuire, and Raul Toledo's Motion for Summary Judgment [ECF No. 57]. Plaintiffs, Bill Alcius and Ricardo Florestal, filed a Response [ECF No. 68]; to which Defendants filed a Reply [ECF No. 70]. The Court has carefully considered the Amended Complaint [ECF No. 8], the parties' written submissions,[1] and applicable law. For the following reasons, the Motion is granted in part and denied in part.

**I. BACKGROUND**

This suit arises out of Plaintiffs' encounter with Defendants on February 13, 2019, at the Party City store located on Oakwood Boulevard in Hollywood, Florida (the "Store"). (*See* Am. Compl. ¶¶ 15, 24). Defendants, named in their individual capacities, are police officers employed by the City of Hollywood Police Department. (*See id.* ¶¶ 7–14).

The encounter culminated in the arrests of both Plaintiffs. (*See id.* ¶¶ 39–40). Defendants

---

[1] The parties' factual submissions include Defendants' Statement of Material Facts [ECF No. 56] ("Defs.' Facts") and Plaintiffs' Statement of Material Facts ("Pls.' Facts") [ECF No. 67]. Defendants did not file a reply to Plaintiffs' Facts, so Plaintiffs' additional facts (*see id.* ¶¶ 42–66) are deemed admitted if they are (i) "supported by properly cited record evidence;" and (ii) do not fall under any exception to Federal Rule of Civil Procedure 56. S.D. Fla. L.R. 56.1(c).

charged Florestal with violating Florida Statute section 810.08(2)(b) (trespassing in an occupied structure) and section 843.02 (resisting an officer without violence), both first-degree misdemeanors. (*See* Defs.' Facts ¶ 40 (citation omitted)). They charged Alcius with violating Florida Statute section 810.08(2)(b) (trespassing in an occupied structure), section 784.03(1)(a) (battery), a first-degree misdemeanor; and section 784.07(2)(b) (battery on an officer), which enhances the battery charge to a first-degree felony. (*See id.* ¶ 41 (citation omitted)).

On November 21, 2019, the State decided not to prosecute Alcius for the battery charges, and he pleaded no contest to trespass. (*See* Pls.' Facts, Ex. 11, Agreed Order to Vacate J. and Sentence and Reopen Case [ECF No. 67-11] 1).[2] Then, on December 21, 2020, in a deposition in Florestal's related criminal case, a third-party witness recanted a sworn statement she had given at the time of the arrests to the effect that Plaintiffs forced their way into the Store. (*See id.*). The State subsequently reopened the case against Alcius and entered a *nolle prosequi*, dismissing all charges against him. (*See id.*, Ex. 12, Circuit Ct. Disposition Order in and for Broward County, Florida [ECF No. 67-12] 1). On January 19, 2021, the State dismissed the case against Florestal, deciding it "could not determine whether [Florestal] was in fact trespassing." (*Id.*, Ex. 10, *Nolle Prosequi* Mem. [ECF No. 67-10] 2 (alteration added)).

In the Amended Complaint, Plaintiffs bring claims against all Defendants under 42 U.S.C. section 1983 for conspiracy to violate Plaintiffs' Fourth Amendment (Count I) and Fourteenth Amendment (Count II) rights. (*See* Am. Compl. ¶¶ 50–74). Alcius brings two claims under section 1983 against Officer Toledo for unlawful arrest (Count III) and use of excessive force (Count IV) in violation of the Fourth Amendment. (*See id.* ¶¶ 75–96). Florestal states one claim against Officer Grontenhuis under section 1983 for unlawful arrest (Count V) in violation of the

---

[2] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

Fourth Amendment.  (*See id.* ¶¶ 97–107).

***Plaintiffs' Version of Events.***  The relevant events began when Plaintiffs arrived at the Store shortly before 8:30 p.m., believing the Store was still open.  (*See* Pls.' Facts, Ex. 1, Alcius Dep. [ECF No. 67-1] 34:3–20).[3]  Alcius and Florestal, two Black men, went to the Store so Florestal could purchase a "full red suit" to wear on Valentine's Day for his girlfriend.  (*Id.*, Ex. 2, Florestal Dep. [ECF No. 67-2] 93:3–25).  When they arrived, the door was locked, so they stood outside with a "balloon delivery man" and waited to be let in.  (Alcius Dep. 38:13–23 (alteration added)).  They were met by Vanessa Clairizier, a merchandise specialist at the Store, who allowed them to enter at the same time as the balloon delivery man.  (*See* Pls.' Facts, Ex. 3, Clairizier Dep. [ECF No. 67-3] 11:11–13, 16:24–17:9).

After Plaintiffs entered the Store, the balloon delivery man told Clairizier that Plaintiffs were "up to no good" and if he were her, he would call the police on Plaintiffs.  (*Id.* 18:4–12).  Clairizier called 911.[4]  (*See* Defs.' Facts ¶ 6 (citation omitted); *see also* Pls.' Facts ¶ 6).  Clairizier told the 911 operator that Plaintiffs "forced their way through the front door" (Clairizier Dep. 52:23–53:1), and there was an "attempted robbery" (*id.* 18:24–25).  But Clairizier remained on the phone with the 911 operator; and — after the balloon delivery man left — told the 911 operator she wanted to cancel the call (*see id.* 19:3–8), advising that the subjects were leaving (*see id.* 19:23–24).  Nonetheless, the Officers were dispatched to the scene.  (*See id.* 19:25–20:1).

Plaintiffs dispute most of the Officers' claims that, when the Officers arrived on the scene,

---

[3] Citations to deposition testimony rely on the pagination and line numbering in the original document.

[4] Plaintiffs originally alleged it was the balloon delivery man who called the police, while Clairizier overheard the call and tried to advise him there was no need for law enforcement.  (*See* Am. Compl. ¶¶ 20–21).  In Plaintiffs' Facts, Plaintiffs agree with the Officers that Clairizier was the one who called the 911 operator in the first instance; but they state she made the call at the "advice of the balloon man[.]" (Pls.' Facts ¶¶ 6, 42 (alteration added; citation omitted)).

they were under the impression Plaintiffs had forced their way into the Store.  (*See* Pls.' Facts ¶¶ 9, 12, 15, 31 (citations omitted); *but see id.* ¶¶ 22, 27 (undisputed that Officer McGuire told Plaintiffs that the Officers were there because of a 911 call stating that Plaintiffs had forced their way into the Store, and Officer Grontenhuis was dispatched based on information that two Black males had forced their way into the Store after it was closed)).  When the Officers entered the Store, Clairizier advised them "everything was okay and that they could leave."  (Defs.' Facts ¶ 16 (citation omitted); *see also* Pls.' Facts ¶¶ 16, 45–46 (citations omitted); Clairizier Dep. 20:1–2).

According to Plaintiffs, they were with the cashier when Officers McGuire and Rillo entered and saw them.  (*See* Pls.' Facts ¶ 20 (citation omitted); *see also* Clairizier Dep. 19:25–20:1).  When Officers McGuire and Rillo saw Plaintiffs, Officer McGuire gave them "verbal commands to show their hands[,]" and "they complied."  (Defs.' Facts ¶ 21 (alteration added; citation omitted); *see also* Pls.' Facts ¶ 21).  The Officers then approached Alcius and Florestal in front of the cashier.  (*See* Alcius Dep. 48:9–11).

Officer Rillo attempted to pat down Florestal but was met with some verbal resistance.  Plaintiffs point to Cellphone Video Footage (*see generally* Pls.' Notice of Filing Cellphone Video Conventionally, Ex. 1, Cellphone Video Footage [ECF No. 66-1]), that Florestal took (*see* Pls.' Facts ¶ 49 (citations omitted)), claiming it shows Florestal complied with the pat down despite "voicing his frustration and recording the process" (*id.* ¶ 48 (citation omitted)).  Plaintiffs explain that Florestal only became irritated and pulled away after Officer Rillo attempted to pat down his "private area[.]"  (Florestal Dep. 143:18–144:11 (alteration added)).

Assisted by Officers Rillo and McEvoy, Officer Grontenhuis then "physically placed Florestal in custody by placing his hands behind his back and placing Florestal in handcuffs,

causing [Florestal's] phone to stop recording[.]"  (Pls.' Facts ¶ 52 (alterations added; citation omitted); *see* Cellphone Video Footage).  The Officers then "pull[ed] [his] head down" and "took [him] out [of] the [S]tore."  (Florestal Dep. 117:10–18 (alterations added)).

Before Florestal was arrested, Officer McGuire patted down Alcius "without incident." (Defs.' Facts ¶ 24 (citing Defs.' Notice of Filing Aff. of Thomas McGuire, Ex. 1, McGuire Aff. [ECF No. 50-1] ¶ 19); *see also* Pls.' Facts ¶ 24).  Plaintiffs point to Alcius's deposition testimony that he was never "belligerent" or "uncooperative with the police officers[.]"  (Alcius Dep. 84:5–14 (alteration added)).  Alcius admits only that he verbally protested Florestal's arrest, telling the Officers "they made a false accusation[.]"  (*Id.* 84:17–20 (alteration added)).  After the Officers walked Florestal out of the Store, Vanessa Montes, the cashier, bagged Plaintiffs' merchandise, handed it to Alcius, and Alcius began to walk out of the Store with Officers McGuire and Toledo following closely.  (*See* Pls.' Facts ¶ 35 (citation omitted); *id.*, Ex. 4, Montes Dep. [ECF No. 67-4] 23:24–24:1).

According to Plaintiffs and Clairizier, the Store Surveillance Video shows Officer Toledo lifting his left elbow into Alcius while walking past him in front of the check-out counter.  (*See* Alcius Dep. 55:20–22; Clairizier Dep. 36:23–25).  Clairizier testified that Officer Toledo "bumped into [Alcius] and made it seem like [Alcius] was the one who bumped into [the Officer]."  (*Id.* 36:23–25 (alterations added)). She further testified that because of "the way the camera is set up you would think it was [Alcius,] but it wasn't him."  (*Id.* 37:25–38:2 (alteration added)).  Officer Toledo then struck Alcius,[5]  and with the other Defendants, "proceeded to attack Alcius while on the ground" before placing him in handcuffs.  (Pls.' Facts ¶¶ 53–54 (citations omitted); *see also*

---

[5] Plaintiffs state "Officer Rillo" was the one who struck Alcius in the head.  (Pls.' Facts ¶ 53).  This appears to be a scrivener's error, since Alcius's excessive force claim — premised on this conduct — is brought against Officer Toledo, not Officer Rillo.  (*See* Am. Compl. ¶¶ 86–96).  The Store Surveillance Video also confirms Officer Toledo was the one who struck Alcius.  (*See* Store Surveillance Video, Video 3 2:17–25).

Alcius Dep. 37:18–20 ("When I tried to leave the store, that's when all the other officers struck me and tried to jump on me.")).  Montes testified that Alcius dropped his phone because of the altercation and blurted, "look what you made me do" to Officer Toledo.  (Montes Dep. 45:10–16).

Defendants did not discover any weapons on either Plaintiff.  (*See* Pls.' Facts ¶ 51).  After they were arrested, "Plaintiffs were placed in separate vehicles and were held for nearly [three] hours."  (*Id.* ¶ 55 (alteration added; citation omitted)).

While in Officer Grontenhuis's vehicle, Florestal "heard [Officer] Grotenhuis [sic] speaking to a supervisor, and heard the supervisor advise[] Grotenhuis [sic] that he [did] not see why he [was] arresting [Plaintiffs]."  (*Id.* ¶ 57 (alterations added; citations omitted)).  Florestal also heard Officer Rillo and the other Officers say that they were going to write on the report that Alcius "dropped his shoulder into [Officer] Toledo."  (*Id.* ¶ 58 (alteration added; citations omitted)).

While Defendants conducted their investigation, Clairizier took Defendants to the back of the Store to review the Store Surveillance Video.  (*See* Clairizier Dep. 22:23–23:8).  The Officers reviewed the entire Store Surveillance Video, including the part that showed Clairizier allowing Plaintiffs to enter the Store.  (*See* Pls.' Facts ¶¶ 61–62 (citations omitted)).  Clairizier also testified that, while they reviewed the footage of Officer Toledo's physical altercation with Alcius, Officer Toledo was insisting that Alcius "hit" him.  (Clairizier Dep. 23:2–8).

Clairizier and Montes signed sworn affidavits saying Alcius forced his way into the Store. (*See* Pls.' Facts, Ex. 6, Clairizier Aff. [ECF No. 67-6] 1; *id.*, Ex. 8, Montes Aff. [ECF No. 67-8] 1).  According to Plaintiffs, Defendants assisted Clairizier and Montes in committing perjury, "directing [them] to write [] false affidavit[s] saying among other things, that [] Plaintiffs were not allowed in the [S]tore, which was notarized by [Officers] Grotenhuis [sic] . . .  and . . . Rillo[.]"

(Pls.' Facts ¶¶ 59–60 (alterations added; citations omitted)). Clairizier testified that Officer Grontenhuis "basically" told the Store clerks "what to write on the statement." (Clairizier Dep. 23:14–24:4; *see also* Montes Dep. 32:25–34:12). She also claims that, because Officer Toledo told her what to write, she wrote that Plaintiffs forced their way into the Store and Alcius "bumped the officer . . . on purpose," even though she knew these statements were not true. (Clairizier Dep. 46:12–17 (alteration added)).

  ***Defendants' Version of Events.*** Defendants state Plaintiffs arrived at the Store around 8:30 p.m. and were told by Clairizier that the Store was closed, and they could not enter. (*See* Defs.' Facts ¶¶ 2–4 (citations omitted)). Then, when Clairizier let the balloon delivery man enter the Store, she allowed Plaintiffs to enter at the same time. (*See id.* ¶ 5 (citation omitted)). "After allowing Plaintiffs to enter, Clairizier called 911 to report an attempted robbery." (*Id.* ¶ 6 (citation omitted)). According to Defendants, Clairizier told the 911 operator:

> (i) two male subjects came inside after the business was closed, (ii) unknown where in the store they are, (iii) black male last seen wearing blue shirt and black pants; (iv) black male last seen wearing purple shirt and blue jeans, (v) they cursed at her when they ran past her, (vi) the subjects forced their way through the front door when she opened it to let someone else in, (vii) unknown if weapons are involved.

(*Id.* ¶ 7 (citation omitted)).[6]

  "Approximately two minutes later, [ ] Clairizier advised that the subjects were gone" (*id.* ¶ 8 (alteration added; citation omitted)), even though she knew "they had not in fact left the [S]tore" (Clairizier Dep. 32:24–33:5, 44:1–11 (alteration added)). Nonetheless, the Officers were dispatched "in reference to [ ] two black males [who] forced their way in after the [S]tore was closed." (Defs.' Facts ¶ 9 (alterations added; citing McGuire Aff. ¶¶ 3, 9); *see also id.* ¶ 12 (citing Defs.' Notice of Filing Aff. of Ryan Rillo, Ex. 1, Rillo Aff. [ECF No. 51-1] ¶ 3); *id.* ¶ 27 (citing

---

[6] Defendants cite to an "Incident Report" that does not appear in the record. (Defs.' Facts ¶ 7).

Defs.' Notice of Filing Aff. of Joshua Grontenhuis, Ex. 1, Grontenhuis Aff. [ECF No. 52-1] ¶ 3);

and *id.* ¶ 31 (citing Defs.' Notice of Filing Aff. of Raul Toledo, Ex. 1, Toledo Aff. [ECF No. 53-1] ¶ 3; Defs.' Notice of Filing Aff. of Daniel McEvoy, Ex. 1, McEvoy Aff. [ECF No. 54-1] ¶ 3)).

Officer McGuire was the first to arrive. (*See* Defs.' Facts ¶ 10 (citation omitted)). "Once on the scene, [he] was advised that the two Black males had left in a silver Honda heading toward[] McDonalds, which happened to [be on the] path he used to enter the [scene]." (*Id.* (alterations added; citation omitted)). He had reason to doubt this was true because, while approaching the scene, he "did not see a silver Honda drive by him." (*Id.* ¶ 11 (citation omitted)). Officer Rillo was also dispatched; upon his arrival, he and Officer McGuire approached the locked Store, and Charles Ferguson, another Store employee, allowed them to enter. (*See id.* ¶¶ 12–14 (citations omitted)).

Officers "McGuire and Rillo spoke to [ ] Clairizier who stated that she had called the police because she was scared of the way the men had forced their way into the [S]tore and when she went to look for them, she couldn't find them." (*Id.* ¶ 15 (alterations added; citation omitted)). Clairizier "then told [Officers] McGuire and Rillo that everything was okay and that they could leave." (*Id.* ¶ 16 (alteration added; citation omitted)). Clairizier testified that she "lied to the police" about Plaintiffs having left the Store. (Clairizier Dep. 32:24–33:14).

Officer McGuire remained suspicious and insisted on "check[ing] the [S]tore to make sure the men were gone[,]" that Clairizier was not "making any statements under duress[,] and that there were no employees being held as hostages in the back." (Defs.' Facts ¶¶ 17–18 (alterations added; citations omitted); *see also* Clairizier Dep. 20:2–4). According to Officer McGuire, the "information [ ] Clairizier provided to 911 was consistent with 'take over robberies' which are robberies that occur when suspects enter businesses at or near closing time and hide while waiting

for an opportunity to commit a robbery[.]" (Defs.' Facts ¶ 19 (alterations added; quoting McGuire Aff. ¶ 13)).

Officer McGuire then "observed two black males[,]" who matched the description Clairizier provided the 911 operator, "walk to the front of the [S]tore." (*Id.* ¶ 20 (alterations added; citation omitted)). The Officers told Plaintiffs to "show their hands" (*id.* ¶ 21 (citation omitted)), explaining they were responding to "a 911 call stating that [Plaintiffs] had forced their wa[y] into the [S]tore when an employee unlocked the door" and "were going to conduct a pat down" (*id.* ¶¶ 22–23 (alterations added; citations omitted)).

Alcius was patted down initially "without incident" (*id.* ¶ 24 (citation omitted)), but when Officer "Rillo attempted to pat down Florestal, [Florestal] pulled away and cursed at Rillo" (*id.* ¶ 25 (alterations added; citations omitted)). Officer Grontenhuis then "attempted to pat down Florestal, who became more verbally confrontational and aggressive." (*Id.* ¶ 28 (citation omitted)). "As a result of Florestal's actions, [Officer] Grotenhuis [sic] attempted to place him in hand restraints." (*Id.* ¶ 29 (alteration added; citation omitted)). Officers McEvoy and Rillo assisted Officer Grontenhuis in restraining Florestal, while Officers Toledo and McGuire spoke to Alcius. (*See id.* ¶¶ 32–35 (citations omitted)).

"At this time, Alcius became angry and was arguing with [Officer] McGuire about Florestal being placed in hand restraints." (*Id.* ¶ 33 (alteration added; citation omitted)). The Officers told Alcius to "leave the store, more than once" and warned if he did not leave, they would arrest him. (*Id.* ¶ 34 (citation omitted)).

According to Defendants, when Officer Toledo, Officer McGuire, and Alcius began walking out of the Store, "Alcius deliberately bumped the left side of [Officer] Toledo's body." (*Id.* ¶ 36 (alteration added; citation omitted)). Officer Toledo then "extended his left hand and

made contact with the right side of Alcius's head, throwing him off balance." (*Id.* ¶ 37 (citations

omitted)). "After a brief struggle and after [Officer] Toledo gave loud clear commands to stop

resisting, Alcius was placed in hand restraints." (*Id.* ¶ 38 (alteration added; citation omitted)).

Alcius's "neck and body were sore from the struggle, but he was fully recovered by the next day

and did not seek medical attention." (*Id.* ¶ 39 (citation omitted)).

   ***Video Footage.*** The parties have submitted video evidence. As noted, Plaintiffs provide

the Cellphone Video Footage to support their claim that Florestal only verbally protested the

Officers' pat down and did not curse at them. (*See* Pls.' Facts ¶¶ 28–30). An independent review

of the Cellphone Video Footage reveals Florestal protesting as one of the Defendants explains that

the Officers received a call that Plaintiffs forced their way in after the Store was closed. (*See*

Cellphone Video Footage 0:00–0:40).[7] Defendants explain that, even though Clairizier told

Defendants "everything was good," they were still "trying to figure out what's up." (*Id.*). At the

point when Officer Rillo begins his pat down, the Cellphone Video Footage becomes muffled and

ends quickly. (*See id.* 0:40–1:09). Throughout this footage, Florestal is not cursing but rather is

repeatedly saying "you can keep trying to pat me down" and asking the Officers how he is resisting.

(*Id.*).

   Defendants proffer three videos from the Store's surveillance system (collectively, the

"Store Surveillance Video"). (*See generally* Defs.' Notice of Filing Video Surveillance

Conventionally, Ex. 1, Store Surveillance Video, Videos 1–3 [ECF No. 48]). The Store

Surveillance Video has no audio but shows Florestal, with his cellphone in his hand, speaking with

the Officers. (*See* Store Surveillance Video, Video 2 0:00–0:08; *id.*, Video 3, 0:00–0:05). Then,

Officer Grontenhuis appears and assists in restraining Florestal, before taking over, handcuffing

---

[7] All footage and audio exhibits were conventionally filed on USB drives. Therefore, citations to audio and video recordings refer to the time stamps provided on the respective files of the conventionally-filed USBs.

him, and finally escorting him out of the Store with the help of Officers Rillo and McEvoy.  (*See id.*, Video 2 0:20–1:00).

The Store Surveillance Video also shows the use of force by Officer Toledo.  (*See id.*, Video 3 2:19–22).  It is inconclusive from the footage whether Alcius bumped into Officer Toledo first or Officer Toledo elbowed Alcius first.  (*See id.* 2:18–19).  The footage shows Alcius and Officer Toledo colliding in a tight space in front of the check-out counter; then, Officer Toledo strikes Alcius on the head, grabs his hair, and forcefully brings him to the ground with assistance from Officer McGuire.  (*See id.* 2:18–22).

## II.  LEGAL STANDARDS

### A.  Summary Judgment Generally

Summary judgment is rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a), (c).  In making this determination, the Court views "the evidence and all factual inferences therefrom in the light most favorable to the non-moving party[.]"  *Skop v. City of Atl., Ga.*, 485 F.3d 1130, 1136 (11th Cir. 2007) (alteration added; quotation marks and citation omitted).  An issue of fact is "material" if it might affect the outcome of the case under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party.  *Id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

At summary judgment, the Court must consider the entire record and not just the evidence singled out by the parties.  *See Clinkscales v. Chevron U.S.A., Inc.*, 831 F.2d 1565, 1570 (11th Cir. 1987).  The non-moving party's presentation of a "mere existence of a scintilla of evidence" in support of its position is insufficient to overcome summary judgment.  *Anderson*, 477 U.S. at 252.

If there are any factual issues, summary judgment must be denied, and the case proceeds to trial. *See Whelan v. Royal Caribbean Cruises Ltd.*, No. 12-cv-22481, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (citing *Env't Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981)). Even when the parties "agree on the basic facts, but disagree about the inferences that should be drawn from these facts[,]" summary judgment "may be inappropriate." *Id.* (alteration added; citation omitted). "If reasonable minds might differ on the inferences arising from undisputed facts, then . . . [c]ourt[s] should deny summary judgment." *Id.* (alterations added; citations omitted).

### B.  Qualified Immunity and Summary Judgment

Defendants seek summary judgment primarily based on their qualified immunity defense. (*See* Ans. & Aff. Def. [ECF No. 37] 10; Mot. 3–11; Reply 6).  Qualified immunity "shields Government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights[.]'" *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009) (alteration added; quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  It "balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  "In cases with multiple named defendants, each defendant is entitled to an independent qualified immunity analysis as it relates to his actions." *Mathews v. Wetherbee*, 839 F. App'x 395, 396 (11th Cir. 2020) (citing *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018)).

To be entitled to the qualified immunity defense, a government official must demonstrate "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991) (quotation marks and

citations omitted). When a defendant acts within the scope of his discretionary authority, the burden "shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (citation omitted).[8] The plaintiff can show qualified immunity is not appropriate by establishing (1) the defendant's conduct violated his constitutional rights; and (2) the constitutional violation was clearly established at the time. *See Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010) (citations omitted). These two requirements may be addressed in any order. *See id.* (citing *Pearson*, 555 U.S. at 236).

The plaintiff "bear[s] the burden of showing that the federal rights allegedly violated were clearly established." *Foy v. Holston*, 94 F.3d 1528, 1532 (11th Cir. 1996) (alteration added; citations omitted). To satisfy the "clearly established" requirement, a law may not be "defined 'at a high level of generality[;]'" rather, "clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 580 U.S. 73, 79 (2017) (alteration added; citations omitted). Although the Supreme Court "do[es] not require a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2007) (alterations added; citations omitted).

There are three ways a plaintiff may show a right was clearly established:

(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law

---

[8] This two-step approach is enshrined in the Eleventh Circuit's *Zeigler/Rich* analysis, which provides:

1. The defendant public official must first prove that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."

2. Once the defendant public official satisfies his burden of moving forward with the evidence, the burden shifts to the plaintiff to show lack of good faith on the defendant's part. This burden is met by proof demonstrating that the defendant public official's actions "violated clearly established constitutional law."

*Courson*, 939 F.2d at 1487 (quoting *Rich v. Dollar*, 841 F.2d 1558, 1563–64 (11th Cir. 1988); other citation and quotation marks omitted); *see also Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir. 1983).

that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.

*Perez v. Suszczynski*, 809 F.3d 1213, 1222 (11th Cir. 2016) (quotation marks and citation omitted).

If case law is used, only decisions of the Supreme Court, Eleventh Circuit, and Florida Supreme Court can clearly establish the law for qualified immunity purposes. *See McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007) (citing *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1032 n.10 (11th Cir. 2001)).

When addressing the qualified immunity defense at summary judgment, "[a]ll issues of material fact are resolved in favor of the plaintiff, and then, under that version of the facts, the legal question of whether the defendant is entitled to qualified immunity is determined." *Sparks v. Ingle*, 724 F. App'x 692, 693 (11th Cir. 2018) (alterations added; citation omitted). "Though factual inferences are made in the [plaintiff's] favor, this rule applies only '*to the extent supportable by the record*[.]'" *Penley v. Eslinger*, 605 F.3d 843, 853 (11th Cir. 2010) (alterations added; citation omitted; emphasis in original). Applying the law to the plaintiff's "best case" allows the Court "to move to the question of whether the defendant committed the constitutional violation alleged in the complaint without having to assess any facts in dispute." *Sparks*, 724 F. App'x at 693 (quotation marks and citation omitted).

### III.  ANALYSIS

Defendants move for summary judgment, arguing (1) they are entitled to qualified immunity on all claims, and (2) the conspiracy claims are further barred by the "intracorporate conspiracy doctrine." (Mot. 11; *see generally id.*; *see also* Reply 6). In response, Plaintiffs assert (1) Defendants are not entitled to qualified immunity because there was no "arguable probable cause" to arrest them (Resp. 3–10); and (2) Defendants waived their intracorporate conspiracy doctrine argument by not pleading it as a defense in their Answer [ECF No. 37] (*see* Resp. 10–

11), or in the alterative, the intracorporate conspiracy doctrine does not apply because the "conspiracy alleged is also a federal crime" (*id.* 11–13). The Court addresses the parties' competing arguments below.

### A. Unlawful Arrest/Excessive Force Claims

Defendants seek summary judgment on the unlawful arrest and excessive force claims based on qualified immunity. (*See* Mot. 5–11). Plaintiffs argue the Officers are not entitled to qualified immunity on these claims, because the arrests and the force used violated clearly-established constitutional law. (*See generally* Resp.).

### 1. Discretionary Functions

The Court first examines whether Defendants were acting within the scope of their discretionary authority. *See Courson*, 939 F.2d at 1487. Responding to a call on a police radio; investigating a potential crime scene; and detaining, arresting, charging, and prosecuting Plaintiffs clearly fall within Defendants' discretionary authority as law-enforcement officers. *See N.C. ex rel. Bos. v. Alonso*, No. 12–Civ-61646, 2013 WL 6564217, at *5 (S.D. Fla. Dec. 13, 2013) (citation omitted). Consequently, Defendants are entitled to invoke the qualified immunity defense. To overcome the defense, the burden shifts to Plaintiffs to show Defendants' conduct violated clearly-established law. *See Foy*, 94 F.3d at 1532.

### 2. Unlawful Arrest Claim by Florestal against Officer Grontenhuis

Florestal states one claim of unlawful arrest against Officer Grontenhuis. (*See* Am. Compl. ¶¶ 97–107). Florestal argues that Officer Grontenhuis is not entitled to qualified immunity on this claim. (*See* Resp. 3–8). Applying the law to Plaintiffs' "best case[,]" *Sparks*, 724 F. App'x at 693 (alteration added; citation and quotation marks omitted), there is no dispute that Officer Grontenhuis had probable cause to arrest Florestal for trespass. Furthermore, even if Officer

Grontenhuis received exculpatory video evidence dissipating probable cause for the trespass, by that time there was probable cause to arrest Florestal for resisting arrest, and no clearly-established law existed requiring Officer Grontenhuis to release Florestal as a consequence.  Thus, there was never a time when Officer Grontenhuis unlawfully arrested Florestal.

To ascertain whether Officer Grontenhuis is entitled to summary judgment on his qualified immunity defense to Florestal's unlawful arrest claim, the Court first considers whether there is a genuine dispute of material fact as to the existence of probable cause.  *See Baxter v. Roberts*, 54 F.4th 1241, 1256 (11th Cir. 2022).  Under the Fourth Amendment, "the 'reasonableness' of an arrest is . . . determined by the presence or absence of probable cause[.]"  *Skop*, 485 F.3d at 1137 (alterations added).  "[P]robable cause exists when the facts, considering the totality of the circumstances and viewed from the perspective of a reasonable officer, establish 'a probability or substantial chance of criminal activity.'"  *Washington v. Howard*, 25 F.4th 891, 898–99 (11th Cir. 2022) (alteration added; quotation marks and citation omitted).  According to Defendants, there is no dispute that Officer Grontenhuis had probable cause to arrest Florestal for trespassing in an occupied structure, in violation of Florida Statute section 810.08(2)(b), and resisting an officer without violence, in violation of Florida Statute section 843.02.  The Court agrees.

"To determine whether [Officer Grontenhuis] had probable cause, [the Court] must look to the elements of the law[s] that [Officer Grontenhuis] arrested [Florestal] for violating."  *Baxter*, 54 F.4th at 1266 (alterations added; citing *Brown v. City of Huntsville*, 608 F.3d 724, 735 (11th Cir. 2010)).  Typically, an officer's "subjective reason for making [an] arrest need not be [related to] the criminal offense[s] as to which the known facts provide probable cause."  *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (alterations added).  "[T]he only question relevant to the objective reasonableness of a seizure is whether probable cause for *some* crime exists."  *Williams v. Aguirre*,

965 F.3d 1147, 1162 (11th Cir. 2020) (alteration added; emphasis in original; citation omitted). This is referred to as the any-crime rule. *See id.* at 1158 (citation omitted).

The Court first considers whether Officer Grontenhuis had probable cause to arrest Florestal for trespassing in an occupied structure. Under Florida law, a person commits the offense of trespass in an occupied structure when he "willfully enters or remains in any structure" "without being authorized" while "there is a human being in the structure[.]" Fla. Stat. §§ 810.08(1), (2)(b) (alteration added). Even when viewing the facts in Plaintiffs' favor, it is undisputed that there was probable cause for Officer Grontenhuis to arrest Florestal for committing a trespass.

The material facts from Plaintiffs' perspective are as follows: (1) Plaintiffs arrived at the Store and attempted to enter, but the doors were locked (*see* Florestal Dep. 105:14–23); (2) a balloon delivery man arrived, and Clairizier allowed him and Plaintiffs into the Store (*see* Defs.' Facts ¶ 5 (citation omitted); Pls.' Facts ¶ 5); (3) the balloon delivery man advised Clairizier to call 911 (*see* Clairizier Dep. 18:5–12); (4) Clairizier called 911 and informed the operator there had been an "attempted robbery," and Plaintiffs "had forced their way through the front door" of the Store (*id.* 18:24–25; 52:23–53:1); (5) Clairizier remained on the phone with the 911 operator, the balloon delivery man left, and Clairizier informed the 911 operator that the police were not needed because Plaintiffs had left in a silver Honda toward McDonalds, despite Clairizier knowing that they had not left (*see id.* 30:17–31:23, 32:23–33:5; Defs.' Facts ¶ 8 (citation omitted); Pls.' Facts ¶ 8); (6) the Officers began to arrive, Clairizier informed them that "everything is fine" and lied by saying that Plaintiffs had left (Clairizier Dep. 32:24–33:14, 58:18–20), but the Officers insisted on investigating the scene because of a potential hostage situation (*see id.* 20:1–4); (7) instead of seeing a silver Honda headed to McDonalds (*see* Defs.' Facts ¶ 11 (citation omitted); Pls.' Facts ¶ 11), Officer McGuire saw Plaintiffs walking to the front of the Store to pay (*see* Defs.' Facts ¶ 20;

Pls.' Facts ¶ 20);[9] (8) after Clairizier's recantations and the appearance of Plaintiffs, Officers Grontenhuis and Toledo arrived on the scene "in reference to two black males that forced their way in after the store was closed" (Defs.' Facts ¶¶ 27, 31 (citation omitted));[10] (9) Officers Rillo and Grontenhuis patted down Florestal, he verbally protested, they attempted to restrain him, and he physically resisted (*see generally* Store Surveillance Video, Video 3); and finally; (10) they put Florestal in handcuffs, arrested him, and physically escorted him out of the Store with the help of another officer (*see generally id.*).

Even viewing these facts from Plaintiffs' perspective, it is clear Officer Grontenhuis arrived on the scene after police dispatch informed him of Clairizier's 911 call advising that two Black males had forced their way into the Store.  (*See* Grontenhuis Aff. ¶ 3).  The information Officer Grontenhuis received from police dispatch — itself based on the information Clairizier gave when she spoke to the 911 operator — supported the reasonable belief that Florestal entered the Store without authorization while Store employees were inside.  *See* Fla. Stat. §§ 810.08(1);

---

[9] Plaintiffs dispute Defendants' statement that "McGuire then observed two black males walk to the front of the store."  (Defs.' Facts ¶ 20; *see* Pls.' Facts ¶ 20).  Plaintiffs point to Alcius's testimony that he was at the front of the Store when he saw the Officers. (*See* Pls.' Facts ¶ 20 (citing Alcius Dep. 48:4–14)).  Because those two observations are not contradictory, Plaintiffs fail to provide evidence to refute Defendants' statement.  *See* Local Rule 56.1(b) ("All material facts set forth in the movant's statement filed and supported as required above will be deemed admitted unless controverted by the opposing party's statement . . . ." (alteration added)); *see also Mid-Continent Cas. Co. v. Basdeo*, 742 F. Supp. 2d 1293, 1305 (S.D. Fla. 2010), *aff'd*, 477 F. App'x 702 (11th Cir. 2012) ("[I]n accordance with Local Rule [56.1], where a party has failed to direct the Court to evidentiary support in the record for any proposed contravening material fact, the Court deems the corresponding proposed uncontroverted material fact admitted for purposes of the [motion] for [s]ummary [j]udgment, provided that the Court finds the statement of material fact at issue to be supported by the evidence." (alterations added; footnote call number omitted)).

[10] To dispute this, Plaintiffs cite Clairizier's testimony that Plaintiffs did not in fact force their way in.  (*See* Pls.' Facts ¶ 31 (citing Clairizier Dep. 42:1–13)).  That does not refute the facts that Clairizier told 911 dispatch that Plaintiffs forced their way in, and this was the information conveyed to the Officers.  (*See* Defs.' Facts ¶ 31 (citations omitted)).

(2)(b);[11] *Watkins v. Dubreuil*, 820 F. App'x 940, 944 (11th Cir. 2020) ("[T]he deputy had probable cause to arrest for trespass because he received apparently reliable information from the Walmart manager that [the suspect] had previously been warned that he was not welcome in the Walmart." (alterations added)); *United States v. Rodger*, 521 F. App'x 824, 829 (11th Cir. 2013) (noting law enforcement officer "had reasonable suspicion to stop [suspect] because he matched the description of the [suspect] given to [the officer] by dispatch." (alterations added; citation omitted)).

According to Plaintiffs, however, by the time the arrest occurred, Clairizier had twice recanted her prior statement, informing both the Officers and the 911 operator that she had made a mistake and Plaintiffs did not force their way into the Store.  (Clairizier Dep. 32:13–22, 33:6–11).  Yet, Plaintiffs provide no evidence that Officers Grontenhuis or Toledo were present when Clairizier recanted or that they heard the recantation.  (*See generally* Resp.; Pls.' Facts).  In fact, the uncontested facts show that Clairizier recanted to Officers McGuire and Rillo (Defs.' Facts. ¶ 15 (citation omitted)),[12] with Officers Grontenhuis and Toledo only showing up after the recantation in response to "two black males that forced their way in after the store was closed" (*id.* ¶¶ 27, 31 (citations omitted)).  Thus, knowledge of Clairizier's recantations cannot be attributed to Officers Grontenhuis or Toledo.

Even if Officers Grontenhuis or Toledo had knowledge of Clairizier's recantations, the circumstances could have given them reason to doubt her recantations.  *Washington* is instructive. *See* 25 F.4th 891.  There, the Eleventh Circuit concluded that an officer was not required to believe

---

[11] Under Florida law, a person commits the offense of trespass in an occupied structure when he "willfully enters or remains in any structure" "without being authorized" while "there is a human being in the structure[.]"  Fla. Stat. §§ 810.08(1), (2)(b) (alteration added).

[12] While Plaintiffs dispute whether they forced their way into the Store, they do not dispute that Clairizier recanted to Officers McGuire and Rillo.  (*See* Pls.' Facts ¶ 15 (citation omitted)).

CASE NO. 22-60386-CIV-ALTONAGA/Strauss

a suspect's recantation after an arrest while the suspect was detained. *See id.* at 902. Specifically, corroborating circumstantial evidence in *Washington* made it reasonable for the officers to discount the suspect's retraction. *See id.* While Clairizier is a witness and not a suspect, there is similar circumstantial evidence that would give the Officers reason to doubt her recantations.

First, Officer McGuire attested that

[b]ased on [his] knowledge and experience, the information that [] Clairizier provided to 911 was consistent with 'take over robberies' which are robberies that occur when suspects enter businesses at or near closing time and hide while waiting for an opportunity to commit a robbery once all the customers have left and the employees are distracted with their closing duties.

(McGuire Aff. ¶ 13 (alterations added)). A reasonable officer — like Officer Grontenhuis — would not necessarily believe Clairizier's retraction of her initial statement if the officer was concerned about duress or a possible hostage situation. *See Mathews*, 839 F. App'x at 397 ("A court must make this determination from the perspective of a reasonable officer on the scene[.]" (alteration added; quotation marks omitted; quoting *Kingsley v. Hendrickson*, 576 U.S. 389 (2015))); *Burse v. Hartzig*, No. 22-11712, 2023 WL 356017, at *4 (11th Cir. Jan. 23, 2023). Second, Clairizier's statements that Plaintiffs had already left (*see* Clairizier Dep. 30:17–31:23, 32:23–33:5), in a silver Honda (Defs.' Facts ¶ 8 (citation omitted); Pls.' Facts ¶ 8; McGuire Aff. ¶ 4), were contradicted when the Officers encountered Plaintiffs in the Store and did not see a silver Honda leaving the scene (*see* Defs.' Facts ¶¶ 11, 20 (citations omitted)).

In short, Officer Grontenhuis was entitled to rely on the information provided by the 911 dispatcher, including that there was an attempted robbery and trespass, to arrest Florestal. *See Watkins*, 820 F. App'x at 944. There is no evidence he heard Clairizier's recantations, and even if he had, circumstances provided reason to doubt them.

Arguably, Officer Grontenhuis's probable cause based on the 911 call could have

20

dissipated in the face of exculpatory evidence. *See Barnett v. MacArthur*, 956 F.3d 1291, 1297 (11th Cir. 2020) (citations omitted). While Defendants conducted their investigation, Clairizier took Defendants to the back of the Store to review the Store Surveillance Video. (*See* Clairizier Dep. 22:20–23:8). The Officers reviewed the entire Store Surveillance Video, including the part that showed Clairizier allowing Plaintiffs to enter the Store. (*See* Pls.' Facts ¶ 61 (citation omitted)). At that point, Officer Grontenhuis could have decided there was no longer probable cause to arrest Florestal for trespass.[13]

But the obligation in *Barnett* to release an arrestee upon viewing exculpatory evidence that "demonstrates beyond a reasonable doubt that there is no longer probable case" was established by the Eleventh Circuit in 2020. 956 F.3d at 1301. Because Florestal's arrest occurred in 2019 (*see* Am. Compl. ¶ 15), Officer Grontenhuis did not violate clearly-established law by arresting Florestal for trespass and failing to release him after watching the Store Surveillance Video, *see Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291–92 (11th Cir. 2009).

In any event, by that point Officer Grontenhuis had probable cause to arrest Florestal for resisting arrest. *See Skop*, 485 F.3d at 1137–38 (no Fourth Amendment violation if probable cause existed for at least one crime). Florida's nonviolent obstruction statute states "[w]hoever shall resist, obstruct, or oppose any officer . . . in the execution of legal process or in the lawful execution of any legal duty, without offering or doing violence to the person of the officer, shall be guilty of a misdemeanor[.]" Fla. Stat. § 843.02 (alterations added).

It is undisputed that Florestal verbally protested his arrest and pulled away. (*See generally*

---

[13] In reference to Defendants coming to view the Store Surveillance Video, Clairizier says that "everyone [was] walking to the back with me." (Clairizier Dep. 21:21–22 (alteration added)). The Officers are not named or described, except for Officer Toledo who is implied to be present because one Officer said "you see, he just hit me" in reference to the Store Surveillance Video. (*Id.* 23:3–4). Taking the facts in the best light for Plaintiffs, Grontenhuis and Toledo saw the Store Surveillance Video with Clairizier.

Cellphone Video Footage; *see also* Pls.' Facts ¶¶ 48–49 (citations omitted); Florestal Dep. 143:18–144:11). When Officer Rillo patted Florestal down, "Florestal pulled away" and physically resisted. (Defs.' Facts ¶ 25 (citation omitted); *see* Pls.' Facts ¶ 49; Florestal Dep. 144:5–10 (Florestal admitting to pulling away during pat down); *see also generally* Store Surveillance Video, Video 3).[14] Then, once Officer Grontenhuis stepped in to assist Officer Rillo and handcuff Florestal, "Florestal became even more verbally confrontational and aggressive[.]" (Mot. 7–8 (alteration added; citing Defs.' Facts ¶ 28); *see also* Defs.' Facts ¶¶ 29–30;[15] Cellphone Video Footage 0:59–1:09; Store Surveillance Video, Video 3 0:12–1:11).

This verbal and physical resistance to the pat down gave Officer Grontenhuis probable cause to arrest Florestal. *See Ainsworth v. Norris*, 469 F. App'x 775, 778 (11th Cir. 2012) (finding officer had "probable cause to arrest [defendant] because he resisted arrest." (alteration added)); *see also Louis-Emile v. Lamberti*, No. 09-60583-Civ, 2010 WL 11602606, at *4 (S.D. Fla. Jan. 12, 2010) (probable cause to arrest under statute existed when suspect "obstructed or opposed" an officer's execution of his lawful duty (citation omitted)); *Devenpeck*, 543 U.S. at 153l; *Davis v. Williams*, 451 F.3d 759, 765 (11th Cir. 2006) (noting that Florida courts generally require that "physical conduct must accompany offensive words to support a conviction under [section] 843.02" (alteration added; citations and footnote call number omitted)).

---

[14] Plaintiffs dispute this fact. (*See* Pls.' Facts ¶ 25). While the Court must resolve all disputed facts in favor of Plaintiffs, *Sparks*, 724 F. App'x at 693, it is not required to accept a "version of the facts" that is "blatantly contradicted by the record[.]" *White v. Ga.*, 380 F. App'x 796, 798 (11th Cir. 2010) (alteration added; citation omitted). Florestal's video footage is the only evidence with audio, and while it does not show Florestal cursing, it reveals him shouting at the Officers. (*See generally* Cellphone Video Footage).

[15] Based on the Cellphone Video Footage, Plaintiffs dispute that after "[Officer] Grotenhuis [sic] attempted to place [Florestal" in hand restraints" Florestal "resisted [Officer] Grotenhuis [sic] by pulling and pushing aggressively." (Defs.' Facts ¶¶ 29–30 (alterations added); *see* Pls.' Facts ¶¶ 29–30). Yet, the video footage ends during the pat down and before Florestal was placed in hand restraints. (*See* Cellphone Video Footage 0:40–1:09). Accordingly, Plaintiffs fail to refute those facts.

Officer Grontenhuis was also executing his lawful duty at the time of arrest. "Florida's obstruction statute makes clear that a citizen commits an obstruction offense *only if* his resistance is in response to the officer's 'lawful execution of a legal duty.'" *Baxter*, 54 F.4th at 1267 (emphasis in original; quoting Fla. Stat. § 843.02). "This inquiry focuses on the specific point in time when the resistance occurred so that the essential inquiry is whether the officer was lawfully executing a legal duty when the obstructing conduct occurred." *Id.* (alteration adopted; citation, emphasis, and quotation marks omitted). As discussed, at the specific moment Florestal was resisting Officer Grontenhuis, the Officer had not yet seen the Store Surveillance Video and therefore had probable cause to arrest Florestal for trespassing.

As such, Officer Grontenhuis had probable cause[16] to arrest Florestal for resisting arrest even if probable cause for trespass later dissipated in the face of exculpatory evidence. Accordingly, there was never a point when Florestal was unlawfully held under arrest. *See Skop*, 485 F.3d at 1137–38 (despite not having probable cause to arrest for one crime, there is no Fourth

---

[16] Additionally, Officer Grontenhuis need only show he had "arguable probable cause" to arrest Florestal. *Cozzi v. City of Birmingham*, 892 F.3d 1288, 1294 (11th Cir. 2018). Arguable probable cause exists where "reasonable officers in the same circumstances and possessing the same knowledge as the [defendant] could have believed that probable cause existed to arrest the [plaintiff]." *Redd v. City of Enter.*, 140 F.3d 1378, 1382 (11th Cir. 1998) (alterations added; citation and quotation marks omitted). An officer lacks arguable probable cause if clearly-established law would put the officer on notice that his conduct was unreasonable. *See Lewis*, 561 F.3d 1288 at 1291–92.

When Officer Grontenhuis arrived, he reasonably believed Defendants were engaged in a lawful duty: patting down Florestal based on the reasonable suspicion that he had forced his way into the Store after hours, as described to Defendants by the 911 dispatcher. (*See* Grontenhuis Aff. ¶¶ 3–5); *United States v. Davis*, 175 F. App'x 286, 289 (11th Cir. 2006) (officer had reasonable suspicion to conduct a lawful investigatory stop while responding to 911 call about burglary where suspect matched the description of the criminal defendant). Plaintiffs do not identify any clearly-established law contradicting the reasonableness of Officer Grontenhuis. (*See generally* Resp.). Officer Grontenhuis also had arguable probable cause to arrest Florestal for violating Florida Statute section 843.02, because Florestal resisted Defendants' pat-down efforts. (*See* Store Surveillance Video, Video 3 0:12–1:11; Florestal Dep. 144:5–10). Again, Plaintiffs fail to identify any case law to satisfy their burden of showing Officer Grontenhuis did not have at least arguable probable cause to arrest Florestal for resisting the pat down. (*See generally* Resp.).

CASE NO. 22-60386-CIV-ALTONAGA/Strauss

Amendment violation if probable cause existed for another crime).

Finally, Officer Grontenhuis would not have unlawfully arrested Florestal even if there was only probable cause to arrest for trespass and no other crime. This is because Officer Grontenhuis had probable cause to arrest Florestal for trespass, the arrest happened in 2019 (*see* Am. Compl. ¶ 15), and the obligation to release an arrestee upon viewing exculpatory evidence that "demonstrates beyond a reasonable doubt that there is no longer probable case" was only established by the Eleventh Circuit in 2020, *Barnett*, 956 F.3d at 1299–1302 (noting how the Fifth Circuit and Sixth Circuit are split on the issue and outlining the debate). Although the Supreme Court "do[es] not require a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741 (alterations added; citations omitted). Accordingly, even if Officer Grontenhuis watched the Store Surveillance Video that showed Plaintiffs did not commit a trespass, Officer Grontenhuis did not violate clearly-established law when he arrested Alcius for trespass and maintained the arrest after watching the Store Surveillance Video. *See Lewis*, 561 F.3d at 1291–92.

Officer Grontenhuis is entitled to qualified immunity on Florestal's unlawful arrest claim.

### 3. Alcius's Unlawful Arrest Claim Against Officer Toledo

Officer Toledo argues summary judgment on Alcius's unlawful arrest claim is appropriate because the Officer is entitled to qualified immunity. (*See* Mot. 5–9). Plaintiffs insist that Officer Toledo is not entitled to qualified immunity because he did not have probable cause or arguable probable cause to arrest Alcius for trespass or battery. (Resp. 3–5; 8–9). The Court concludes Officer Toledo had probable cause or arguable probable cause to arrest Alcius for trespassing and at least arguable probable cause to arrest Alcius for battery.

24

### a. Trespass

Officer Toledo had probable cause to arrest Alcius for the crime of trespass for the same reasons Officer Grontenhuis had probable cause to arrest Florestal.  When he arrived on the scene, Officer Toledo, like Officer Grontenhuis, had reliable information from the police dispatcher that Alcius was trespassing.  (*See* Toledo Aff. ¶ 3).  The information from the dispatcher gave the Officer probable cause[17] to arrest Alcius.  *See Watkins*, 820 F. App'x at 944; *Rodger*, 521 F. App'x at 829.  Additionally, there is no evidence that Officer Toledo was present when Clairizier recanted her statements.  (*See generally* Resp., Pls.' Facts).  And even if he was, Clairizier's retractions would not preclude a reasonable officer — like Officer Toledo — from believing that Alcius had committed a crime.  *See Burse*, 2023 WL 356017, at *4.

### b. Battery and Battery on a Law Enforcement Officer

Officer Toledo also had at least arguable probable cause to arrest Alcius based on his reasonable belief that Alcius violated Florida Statute sections 784.03(1)(a)(1) for battery and 784.07(2)(b) for battery on a law enforcement officer.  Under Florida law, a person commits a battery when the person "actually and intentionally touches or strikes another person against the will of the other[.]"  Fla. Stat. § 784.03(1)(a)(1) (alteration added).  Section 784.07 is an "enhancement statute" that "reclassifies the criminal offense of battery from a misdemeanor of the first degree to a felony of the third degree when the battery is on a law enforcement officer." *United States v. Jackson*, No. 6:12-cr-202, 2013 WL 784650, at *4 n.4 (M.D. Fla. Mar. 1, 2013), *aff'd*, 558 F. App'x 932 (11th Cir. 2014) (citing Fla. Stat. § 784.07(2)(b)).

According to Plaintiffs and Clairizier, Alcius did not initiate the physical altercation with Officer Toledo.  (*See* Pls.' Facts ¶¶ 36, 53; Clairizier Dep. 36:23–25).  Rather, Officer Toledo

---

[17] Officer Toledo also had arguable probable cause for the same reasons as Officer Grontenhuis.

"bumped into him and made it seem like he was the one who bumped into" the Officer.  (Clairizier Dep. 36:24–25).[18]  Plaintiffs' account is not clearly contradicted by the Store Surveillance Video, as Defendants claim.  (*See* Reply 3 n.6).  Rather, the Store Surveillance Video is unclear as to who bumped who first.  (*See* Store Surveillance Video, Video 3 2:17–2:20); *cf. Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Even though the Store Surveillance Video does not clearly show Alcius bumping into Officer Toledo, that is not enough to show the arrest was unlawful.  *See United States v. Gonzalez*, 969 F.2d 999, 1004 (11th Cir. 1992) ("The Supreme Court has repeatedly recognized the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants." (quotation marks and citation omitted)).  When Alcius and Officer Toledo came in contact, the Officer was "engaged in the lawful performance of [] his duties[,]" Fla. Stat. § 784.07(2)(b) (alterations added); he was concluding his investigation of the scene and was not even directly engaging with Alcius (*see* Store Surveillance Video, Video 3 2:17–2:20); *cf. Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1260 (11th Cir. 2010) (investigating is "lawful and part of their duties as law enforcement officers").  Plaintiffs cannot reasonably dispute these facts.  *White*, 380 F. App'x at 798.

---

[18] Clairizier's statement that Officer Toledo made it seem like Alcius bumped into him appears to be an inference based on Officer Toledo "rewinding [the Store Surveillance Video] back" and saying "you see how [Alcius] hit me" (Clairizier Dep. 37:4–5 (alterations added)); and "you see, you see, he just hit me" (*id.* 23:3–4 (alteration added)).  In other words, it appears Clairizier is pointing out that Officer Toledo was advocating for a version of events in which he was hit first.  In contrast, if Clairizier is inferring that Officer Toledo is fabricating a story and framing Alcius, such an inference is unsupported by Clairizier's statements about Toledo advocating for his narrative.  The Court draws all reasonable inferences in Plaintiffs' favor, *see Lee*, 284 F.3d at 1194 (citation omitted), but "an inference based on speculation and conjecture is not reasonable[,]" *Blackston v. Shook and Fletcher Insulation Co.*, 764 F.2d 1480, 1482 (11th Cir. 1985) (alteration added; citation omitted).

CASE NO. 22-60386-CIV-ALTONAGA/Strauss

In sum, the Court cannot conclude a reasonable officer "would have known under the circumstances" and "on pain of violating the Constitution" that Alcius did not commit a battery. *Wolk v. Seminole Cnty.*, 276 F. App'x 898, 900 (11th Cir. 2008). Finally, as with Grontenhuis, Toledo's arrest of Alcius was not unlawful regardless of whether arguable probable cause for battery existed because Officer Toledo had probable cause to arrest Alcius for trespass. Moreover, maintaining the arrest after watching the exculpatory Store Surveillance Video was not a violation of clearly-established law at the time of the arrest. *See Lewis*, 561 F.3d 1288, at 1291–92; *Barnett*, 956 F.3d at 1301. Accordingly, the Court finds that Officer Toledo is entitled to qualified immunity on Alcius's unlawful arrest claim.

### 4. Alcius's Excessive Force Claim Against Officer Toledo

Officer Toledo contends he is also entitled to qualified immunity regarding Alcius's section 1983 claim for use of excessive force in violation of the Fourth Amendment. (*See* Am. Compl. ¶¶ 86–96; Mot. 9–11). Alcius argues that Officer Toledo is not entitled to qualified immunity on the excessive force claim, because he was not dangerous and Officer Toledo had no probable or arguable probable cause to arrest him. (*See* Resp. 9–10 (citing *Sheth v. Webster*, 145 F.3d 1231, 1238 (11th Cir. 1998); *Thornton v. City of Macon*, 132 F.3d 1395, 1400 (11th Cir. 1998))).[19] Defendants insist Officer Toledo's use of force was "minimal[,]" "reasonable," and "necessary . . . to take Alcius into custody." (Reply 5–6 (alterations added)). Once again, the Court must determine whether there was a violation of constitutional law and, if so, whether that violation was clearly established.

The Court first considers whether, under Plaintiffs' version of the facts, there was a "violation of a constitutional right." *Hines v. Jefferson*, 795 F. App'x 707, 712 (11th Cir. 2019)

---

[19] Plaintiff confuses the issues. Probable cause or lack thereof is not determinative of the issue of excessive force. *See Graham v. Connor*, 490 U.S. 386, 396 (1989).

(alteration added; citation omitted).  Use of excessive force constitutes a violation of the Fourth Amendment.  *Davis*, 451 F.3d at 767.  "The standard for whether the use of force was excessive under the Fourth Amendment is one of 'objective reasonableness.'"  *Long v. Slaton*, 508 F.3d 576, 580 (11th Cir. 2007) (quoting *Graham* 490 U.S. at 388); *see also Hinson v. Bias*, 927 F.3d 1103, 1117 n.9 (11th Cir. 2019).

Under the objective-reasonableness test, courts do not speculate as to an officer's subjective thoughts but rather assess the officer's actions for objective reasonableness under established constitutional law.  *See Harlow*, 457 U.S. at 818; *see also Galvez v. Bruce*, 552 F.3d 1238, 1243 (11th Cir. 2008) ("[T]he question we ask is whether, under [the plaintiff's] version of the facts, [the officer] behaved reasonably in the light of the circumstances before him." (alterations added; citation and quotation marks omitted)); *Fils v. City of Aventura*, 647 F.3d 1272, 1288 (11th Cir. 2011) ("At summary judgment, [a court] cannot simply accept the officer's subjective version of events, but rather must reconstruct the event in the light most favorable to the non-moving party, and determine whether the officer's use of force was excessive under those circumstances." (alteration added; citation omitted)).

"Because there are no 'bright line' rules for determining when an officer's use of force goes from being necessary to excessive, the analysis requires weighing 'all the circumstances.'"  *Holloway v. Diaz*, No. 11-23069-Civ, 2013 WL 5372846, at *5 (S.D. Fla. Sept. 25, 2013) (quoting *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997)).  Some factors courts consider include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396 (citation omitted); *see also Hinson*, 927 F.3d at 1116–18 & n.9 (identifying other factors courts consider including "the need for force to be applied[,]" "the

amount of force applied in light of the nature of the need[,]" and "the severity of the injury[;]" and emphasizing that the excessive force inquiry is an objective one, so courts may not consider whether the officer applied force "maliciously and sadistically" (alterations added; citations and footnote call number omitted)).  "Although suspects have a right to be free from force that is excessive, they are not protected against a use of force that is necessary in the situation at hand." *Jean–Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (quotation marks and citations omitted).

Once a court decides whether a jury could find the use of force was excessive, the plaintiff must demonstrate that the conduct was a violation of the plaintiff's clearly-established constitutional rights.  *See Hinson*, 927 F.3d at 1116.  There are "two methods to determine whether a reasonable officer would know that his conduct is unconstitutional under the Fourth Amendment."  *Stephens v. DeGiovanni*, 852 F.3d 1298, 1315 (11th Cir. 2017) (quotation marks and citation).  "The first is to point to a 'materially similar case that has already decided that what the police officer was doing was unlawful.'"  *Lee*, 284 F.3d at 1198 (alteration adopted; quotation marks and citation omitted).  The second method — known as the "obvious-clarity" test — is to show that the officer's conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the officer, *notwithstanding the lack of fact-specific case law*."  *Stephens*, 852 F.3d at 1315 (emphasis in original; quotation marks and citation omitted).

*a. Violation of Constitutional Law*

If — as Plaintiffs say occurred — Officer Toledo initiated the physical altercation by bumping his left elbow into Alcius, and then struck Alcius on the head and forced him to the ground, a jury could find the force the Officer used was excessive.  (*See* Pls.' Facts ¶¶ 36, 38;

Clairizier Dep. 36:23–25 ("[Alcius] was walking out the store to leave the store and then [Officer Toledo] bumped into [Alcius] and made it seem like [Alcius] was the one who bumped into [the Officer]." (alterations added)); Store Surveillance Video, Video 3 2:17–18); *Richmond v. Badia*, 47 F.4th 1172, 1183 (11th Cir. 2022) (concluding "a reasonable jury could find that [the officer's] use of force was excessive" when officer initiated altercation by grabbing plaintiff's face (alteration added)); *see also Lucibella v. Town of Ocean Ridge*, No. 22-11056, 2023 WL 2822126, at *7 (11th Cir. Apr. 7, 2023) (denying qualified immunity defense on excessive force claim even when plaintiff admitted "to angrily poking [an officer] in the chest in response to [the officer] pushing him" (alterations added)).[20]

The Eleventh Circuit has "repeatedly ruled that a police officer violates the Fourth Amendment . . . if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands." *Saunders v. Duke*, 766 F.3d 1262, 1265 (11th Cir. 2014) (alteration added; collecting cases); *see also Richmond*, 47 F.4th at 1182. Plaintiffs present evidence that could show Officer Toledo's use of force was gratuitous and that Alcius was under control, not "resisting" and not disobeying commands when the force was used. *Saunders*, 766 F.3d at 1265; (*see* Defs.' Facts ¶ 24; Pls.' Facts ¶ 24 (undisputed that Alcius was patted down "without incident"); Alcius Dep. 84:5–14 (testifying he was never "belligerent" or "uncooperative" with Defendants); Clairizier Dep. 22:5–6, 36:23–37:8, 37:18–19 (testifying she had a "clear view" of Officer Toledo hitting Alcius first while Alcius was "walking" out the store and that Alcius "didn't even do nothing"); Montes Dep. 45:10–16 (testifying that Alcius

---

[20] The question of whether Alcius bumped into Officer Toledo first is a point that the parties vigorously dispute. (*See* Defs.' Facts ¶ 36; Pls.' Facts ¶¶ 36, 56; *see generally* Mot., Resp., Reply). "At this stage in the proceedings, [the Court] must credit [Alcius's] version of the facts." *Lucibella*, 2023 WL 2822126, at *4 n.5.

dropped his phone as a result of the physical contact and said "look what you made me do" to Officer Toledo)).

The Eleventh Circuit also has "repeatedly held that less force is appropriate when the crime at issue is a misdemeanor, and the suspect does not pose a threat or attempt to flee." *Richmond*, 47 F.4th at 1183 (citations omitted); *see also Reese v. Herbert*, 527 F.3d 1253, 1274 (11th Cir. 2008); *Stephens*, 852 F.3d at 1322 (determining slaps and hits to the chest were excessive where suspect was not resisting or attempting to flee and the crimes at issue were misdemeanors); *Stryker v. City of Homewood*, 978 F.3d 769, 774 (11th Cir. 2020) (finding excessive force where the crime at issue was a misdemeanor and suspect did not attempt to flee or pose a threat).  The potential crime here, according to Defendants, was trespassing in an occupied structure, a first-degree misdemeanor.  (*See* Defs.' Facts ¶ 41 (citation omitted)).  Additionally, there is no evidence that Alcius posed a threat or attempted to flee.  (*See id.* ¶¶ 24, 35 (citations omitted)).

At bottom, Plaintiffs' evidence, in the light most favorable to them, creates a genuine issue of fact as to whether the amount of force Officer Toledo used was "gratuitous" and therefore "excessive." *Patel v. City of Madison, Ala.*, 959 F.3d 1330, 1339 (11th Cir. 2020) ("[A] jury could reasonably find that [the plaintiff] was not resisting when [the officer] forcefully took him to the ground and that [the officer's] force was both gratuitous and excessive[.]" (alterations added)).  The Court therefore cannot conclude that these facts are so "blatantly contradicted" or "so utterly discredited" by the video evidence, such that "no reasonable jury could believe [them]."  *Scott*, 550 U.S. at 380 (alteration added).  Rather, the Store Surveillance Video is inconclusive as to whether Officer Toledo was the first to initiate physical contact by elbowing Alcius.  (*See* Store Surveillance Video 2:19–2:20); *see also Gregory v. Miami-Dade Cnty., Fla.*, 719 F. App'x 859, 868 (11th Cir. 2017) (concluding video evidence did "not so blatantly contradict [ ] testimony as

to render it utterly discredited and to preclude the existence of a genuine dispute of material fact." (alteration added)).

Additionally, the record evidence casts doubt on whether the video evidence is reliable for determining who initiated contact. Clairizier testified that "the way the camera is set up you would think it was [Alcius who hit first] but it wasn't him." (Clairizier Dep. 37:25–38:2 (alteration added)). Video footage based on an "unhelpful angle and distance . . . and unhelpful camera placement . . . provides little value on summary judgment." *Keels v. Zambrana*, No. 15-cv-80546, 2018 U.S. Dist. LEXIS 119133, at *13 (S.D. Fla. July 16, 2018) (alterations added). Under Plaintiffs' version of events, a jury could reasonably find that Officer Toledo used unnecessary and excessive force in violation of Alcius's Fourth Amendment rights.

### b. *Clearly-Established Law/Obvious Clarity*

The Court also cannot conclude Officer Toledo is entitled to qualified immunity on the excessive force claim because disputes of fact remain as to whether his conduct was violative of clearly-established law or, in the alternative, whether the unconstitutionality of the conduct was obviously clear.

***Clearly-Established Law.*** Accepting Plaintiffs' version of the facts, Officer Toledo would have had fair notice that gratuitous use of force was violative of clearly-established law. *Compare Fils*, 647 F.3d at 1289 ("unprovoked force against a non-hostile and non-violent suspect who has not disobeyed instructions violates that suspect's rights under the Fourth Amendment"), *and Lucibella*, 2023 WL 2822126, at *8 (finding violation of clearly-established law when "a jury could reasonably find that [the plaintiff] acted in a non-violent manner, did not resist arrest, and obeyed [the officer's] commands . . . and that [the officer] used unprovoked and excessive force when he grabbed [plaintiff's] arms and threw him on the ground without notice." (alterations

added; footnote call numbers and citations omitted)); *with Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347, 1351, 1355 (11th Cir. 2015) (concluding the officers' use of force in "striking, kicking, and tasing the resisting and presumably dangerous suspect" was not excessive where the suspect, although pinned on the ground, was "refusing to surrender his hands to be cuffed" (citation omitted)), *and Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1334–35 (11th Cir. 2004) (concluding the officer's use of force was not excessive where suspect, although lying face down on the ground "had not yet been handcuffed" and "was able to wrestle his hand loose and push [the officer's] foot away" (alteration added)).

At the time of the events here, it was clearly established that "gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force." *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008); *see also Fils*, 647 F.3d at 1289; *Sheth*, 145 F.3d at 1238 (finding officer was not entitled to qualified immunity on excessive force claim where "[t]here [was] no evidence in the record to suggest that plaintiff posed a danger to the officer or others" (alterations added)). This is particularly true when the "potential crime at issue" is a misdemeanor. *Richmond*, 47 F.4th at 1183 (citing *Reese*, 527 F.3d at 1274; other citations omitted).

If a jury believes Plaintiffs' version of events, the force Officer Toledo used could be considered gratuitous. (*See* Pls.' Facts ¶¶ 53–54 (citations omitted)). Plaintiffs also claim Alcius was not resisting commands and did not otherwise pose any danger to the Officers; according to Plaintiffs, Alcius was merely walking out of the Store after complying with a lawful pat down when Officer Toledo initiated the physical altercation by elbowing him. (*See id.*). Under these circumstances, Officer Toledo would not be entitled to qualified immunity because his conduct would have violated clearly-established law. *See Thornton*, 132 F.3d at 1400 (concluding that [u]nder the circumstances, the officers were not justified in using *any* force, and a reasonable

officer thus would have recognized that the force used was excessive" when plaintiffs were not "suspected of having committed a serious crime, [and] neither posed an immediate threat to anyone, [nor] actively resisted arrest" (alterations added; emphasis in original)).

Defendants argue the force Officer Toledo used was *de minimis*. (*See* Reply 6). Even *de minimis* force would have been excessive under clearly-established law if Plaintiffs are correct that the "physical confrontation was unrelated to any law enforcement need to restrain or arrest" Alcius. *Richmond*, 47 F.4th at 1183. According to Plaintiffs, when Officer Toledo elbowed and then struck Alcius, Alcius was walking out of the Store — Officer Toledo was not trying to restrain or arrest him. (*See* Pls.' Facts ¶ 53 (citation omitted)). If a jury credits these facts, this case is not analogous to cases where courts have held that officers can use *de minimis* force in lawfully restraining or arresting a suspect. *See, e.g.*, *Croom v. Balkwill*, 645 F.3d 1240, 1252–53 (11th Cir. 2011) (finding use of force was lawful where officers were executing search pursuant to a warrant and were thus authorized to exercise "unquestioned command of the situation"); *Jones v. City of Dothan, Ala.*, 121 F.3d 1456, 1458, 1460–61 (11th Cir. 1997) (finding officers lawfully used force when they detained plaintiff, who matched the description of the "harasser they were pursuing"). Unlike those cases, under Plaintiffs' version of the facts, there would be no apparent "law enforcement justification" for elbowing Alcius, striking him on the back of the head, and throwing him to the ground. *Richmond*, 47 F.4th at 1182 (citation omitted).

Thus, Officer Toledo's conduct could have violated clearly-established law even if it was *de minimis*.

**Obvious-Clarity.** Even if the cited cases are not sufficient to establish a violation of clearly-established law, a jury still could find Officer Toledo is not entitled to qualified immunity because his use of force was "disproportionate." *Stephens*, 852 F.3d at 1318 ("In an obvious-clarity case,

where the officer's conduct is plainly objectively unreasonable, a court does not need prior case law to determine the force used by the officer was excessive and unlawful, because it was disproportionate."). The jury could find that the Store Surveillance Video, in conjunction with the testimony, reveal "unprovoked force exerted on [Alcius] by [Officer Toledo]." *Id.* at 1326 (alterations added); (*see* Store Surveillance Video, Video 3 2:18–22).

If a jury finds Officer Toledo's use of force was "over-reactive and disproportionate relative to the response of the apprehended person[,]" Officer Toledo would not be entitled to qualified immunity. *Richmond*, 47 F.4th at 1185 (alteration added; citation omitted); *see also Stephens*, 852 F.3d at 1324 n.27 ("[A] jury could reasonably find that the *degree* of force the officers used in this case was not justifiable under the circumstances." (alteration added; emphasis in original; quoting *Deville v. Marcantel*, 567 F.3d 156, 167–68 (5th Cir. 2009)); *Landsman v. City of Vero Beach*, 621 F. App'x 559, 563 (11th Cir. 2015) ("There is a broad statement of principle ensconced in our case law that clearly establishes that the use of force against an arrestee who, *inter alia*, is not a threat, has not exhibited aggressive behavior, and has not actively resisted arrest is excessive." (footnote call number omitted; citing *Lee*, 284 F.3d at 1198–1200; *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 927 (11th Cir. 2000)). Consequently, Officer Toledo is not entitled to qualified immunity on the excessive force claim.

### B. Conspiracy Claims

The only remaining claims to consider are the section 1983 claims against all Defendants for (1) conspiring to violate Plaintiffs' Fourth Amendment rights by falsifying the evidence supporting probable cause for their arrests and prosecution; and (2) conspiring to violate Plaintiffs' Fourteenth Amendment rights to due process and to be free from excessive force. (*See* Am. Compl. ¶¶ 50–74). Defendants' primary argument in support of summary judgment rests on the

intracorporate conspiracy doctrine.  (*See* Mot. 11–12).  Defendants also briefly argue they are entitled to qualified immunity on the conspiracy claims.  (*See* Reply 6).  The Court first considers whether Defendants are entitled to qualified immunity on the conspiracy claims before addressing the intracorporate conspiracy argument.

### 1. Qualified Immunity

A conspiracy under section 1983 requires (1) an agreement or understanding by two or more individuals to deprive a person of his constitutional rights, and (2) the commission of an overt act that results in "an actual denial of one of his constitutional rights."  *Weiland v. Palm Beach Cty. Sheriff's Off.*, 792 F.3d 1313, 1327 (11th Cir. 2015) (citing *Hadley*, 526 F.3d at 1332). "Factual proof of the existence of a [section] 1983 conspiracy may be based on circumstantial evidence."  *Runge v. Snow*, 514 F. App'x 891, 895 (11th Cir. 2013) (alteration added; citing *Burrell v. Bd. of Trs. of Ga. Military Coll.*, 970 F.2d 785, 789 (11th Cir. 1992)).  Even if a plaintiff puts forth sufficient facts to support a conspiracy, a defendant is entitled to qualified immunity if the constitutional violations were not clearly established.  *See Valentine v. Robinson*, 601 F. App'x 778, 783 n.7 (11th Cir. 2015).

As an initial matter, Defendants are entitled to qualified immunity on Plaintiffs' Fourth Amendment conspiracy claim that Defendants falsified evidence supporting probable cause for their arrests and prosecution.[21]  "[T]he absence of probable cause is undoubtably a requirement for a claim of malicious prosecution" under the Fourth Amendment.  *Williams*, 965 F.3d at 1159 (alteration added).  As explained, Defendants had probable cause to arrest Alcius and Florestal for

---

[21] Plaintiffs do not clearly explain what constitutional violations occurred, but it appears they are making a malicious prosecution claim under the Fourth Amendment.  Specifically, Plaintiffs allege Defendants conspired to violate their Fourth Amendment rights by arresting them and eventually prosecuting them without probable cause.  (*See* Am. Compl. ¶ 58).  Plaintiffs also allege "Defendants agreed to charge" Plaintiffs without probable cause.  (*Id.* ¶¶ 39, 40).  These statements suffice to allege a conspiracy to fabricate incriminating evidence to arrest, charge, and prosecute without probable cause.

trespass without relying on any falsified evidence.  *See Franks v. Delaware*, 438 U.S. 154, 156 (1978) (finding that Fourth Amendment was implicated when allegedly false evidence was "necessary to the finding of probable cause").  While viewing the Store Surveillance Video may have dissipated probable cause for trespass, by that point, Defendants had probable cause to arrest Florestal for resisting arrest and Alcius for battery.  Under the any-crime rule, there is no unlawful arrest claim under the Fourth Amendment as long there is probable cause for some crime.  *See Lee*, 284 F.3d 188 at 1195–96.  Thus, the key question for Plaintiffs' Fourth Amendment conspiracy claim — and one that the Eleventh Circuit addressed in *Williams* — is whether the any-crime rule applies to malicious prosecution claims under the Fourth Amendment.

At the time of the incident, it was not clearly established that the any-crime rule did not apply to malicious prosecution claims.  *See Williams*, 965 F.3d at 1157 (noting that "[w]hether the any-crime rule extends to malicious prosecution is unsettled." (alteration added)).  It was not until 2020 — one year after the incident at issue — that the Eleventh Circuit decided that the any-crime rule did not apply to such claims.  *See id.* at 1162.  Thus, Defendants were not on notice that it was a violation of the Fourth Amendment to fabricate evidence to maintain probable cause for one crime when there was probable cause for another crime.  As such, Defendants are entitled to qualified immunity on Plaintiffs' Fourth Amendment conspiracy claim.

The Court moves to Plaintiffs' other conspiracy claim and begins by considering whether a jury could find a conspiracy to violate Plaintiffs' Fourteenth Amendment rights and then evaluates whether those rights were clearly established at the time.

### a. *Existence of a Conspiracy to Violate Plaintiffs' Constitutional Rights*

Plaintiffs do not specifically explain the constitutional rights Defendants' conduct allegedly violated — putting their conspiracy claims on shaky footing.  *See Hadley*, 526 F.3d at

1332 (finding summary judgment on section 1983 conspiracy claim was appropriate in part because the court was "left completely in the dark about the constitutional basis for the claim"). They largely allege the same facts in support of both their Fourth and Fourteenth Amendment conspiracy claims (*see* Am. Compl. ¶¶ 33–49; *see also* Resp. 12), so it is unclear which facts support which claim. This is particularly true of Plaintiffs' Fourteenth Amendment claim.[22] But the Court need not go so far as to "imagine some possibilities" of the constitutional violations that Plaintiffs allege. *Hadley*, 526 F.3d at 1332.

It appears Plaintiffs accuse Defendants of violating the Fourteenth Amendment by concocting a conspiracy to violate Plaintiffs' right to "bodily integrity and to be free from excessive force[.]" (Am. Compl. ¶ 68 (alteration added)).[23] It is also discernible, based on the alleged facts regarding Defendants conspiring to fabricate probable cause and cover up the use of excessive force (*see id.* ¶¶ 37–40, 43–45), that Plaintiffs assert Defendants conspired to hinder

---

[22] While Plaintiffs state they had a clearly-established right "under the Fourteenth Amendment to bodily integrity and to be free from excessive force" (Am. Compl. ¶ 68 (alteration added)), neither the Amended Complaint nor anything else in the record specifically identifies how the Officers violated Plaintiffs' Fourteenth Amendment rights (*see id.* ¶¶ 70–71 (alleging "an actual denial of the Plaintiffs [sic] *Fourth* Amendment constitutional rights" in Fourteenth Amendment Count (emphasis added))). In their Response, Plaintiffs claim "there was an elaborate plan amongst [ ] Defendants to violate [ ] Plaintiffs [sic] [F]ourth [A]mendment rights by having them arrested with no probable cause" — omitting any discussion of the Fourteenth Amendment conspiracy claim. (*Id.* 12 (alterations added)).

[23] For the excessive force claims, "the Fourth Amendment covers arrestees . . . and the Fourteenth Amendment covers 'those who exist in the in-between — pretrial detainees.'" *Crocker v. Beatty*, 995 F.3d 1232, 1246 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 845 (2022) (alteration added; quoting *Piazza v. Jefferson Cnty.*, 923 F.3d 947, 952 (11th Cir. 2019)). "The Supreme Court long ago described a pretrial detainee as a person who had received a judicial determination of probable cause as a prerequisite to the extended restraint of his liberty following arrest." *Id.* at 1247 (alterations adopted; quotation marks and citation omitted). Because there was no judicial determination of probable cause at the time of Plaintiffs' arrests, it is not obvious that Plaintiffs were pre-trial detainees such that the Fourteenth Amendment provides the correct framework for Plaintiffs' excessive force conspiracy claims. But the Eleventh Circuit recently reiterated that "the line is not always clear as to when an arrest ends and pretrial detainment begins[,]" and so the Court considers the Fourteenth Amendment excessive force claim. *Id.* (alteration added; quotation marks and citation omitted).

Plaintiffs' access to the courts and deny Plaintiffs their due process rights. *See Hadley*, 526 F.3d at 1332.

As a preliminary matter, Plaintiffs have offered evidence from which a jury could "discern an agreement between the Defendants to" fabricate probable cause and "cover up the use of excessive force." *Id.* at 1333; *cf. Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty., Fla.*, 956 F.2d 1112, 1122 (11th Cir. 1992) ("No reasonable juror could have found a conspiracy because [the plaintiff] presented *no evidence* of one." (alteration and emphasis added)).

Plaintiffs point to several facts indicating the Officers reached an agreement or understanding to fabricate probable cause or immunize Officer Toledo's use of force. (*See* Pls.' Facts ¶¶ 57–63). According to Plaintiffs, while Florestal was in Officer Grontenhuis's vehicle, he "heard [Officer] Grontenhuis speaking to a supervisor, and heard the supervisor advise[] Grontenhuis that he [did] not see why he [was] arresting [Plaintiffs]." (*Id.* ¶ 57 (alterations added; citation omitted)). Florestal also heard Officer Rillo and the other Defendants discussing that they were going to write on the report that Alcius "dropped his shoulder into [Officer] Toledo." (*Id.* ¶ 58 (alteration added; citations omitted)). Those facts could support a finding of an understanding or an agreement between the Officers. The Court therefore considers whether the possible Fourteenth Amendment violation gives rise to a viable section 1983 claim.

To start, Plaintiffs cannot argue that Defendants conspired to deprive Plaintiffs of their Fourteenth Amendment rights by using excessive force (*see* Am. Compl. ¶ 68), because the alleged conspiratorial acts occurred *after* the allegedly unconstitutional action (*see id.* ¶ 33 ("[a]fter the Plaintiffs were taken into custody . . ." (alterations added)). *See, e.g.*, *Harris v. City of Boynton Beach*, No. 9:16-cv-80148, 2016 WL 3971409, at *8 (S.D. Fla. July 25, 2016) ("The[] alleged

conspiracy could not have resulted in the denial of [the] [p]laintiff's constitutional rights" if the violation of those rights "had already occurred[.]" (alterations added)).

In contrast, the alleged fabrication of incriminating evidence and the attempt to cover up the use of excessive force occurred *after* the alleged conspiratorial acts and while Plaintiffs were detained. (*See* Am. Compl. ¶¶ 33–49; Pls.' Facts ¶¶ 57–63). Thus, the Court considers whether a reasonable jury could conclude that the fabrication of evidence and attempt to cover up excessive force, if true, would violate Plaintiffs' constitutional rights under the Fourteenth Amendment.

Plaintiffs allege Defendants conspired to violate their Fourteenth Amendment rights by agreeing to (1) use excessive force in violation of their bodily integrity and (2) fabricate probable cause and cover up the use of excessive force in violation of due process. (*See* Am. Compl. ¶¶ 50–74). As the Court has already described, the first argument fails because none of the alleged conspiratorial acts occurred prior to the use of force. *See Harris*, 2016 WL 3971409, at *8.

Turning to Plaintiffs' second argument: if the jury were to find Defendants reached an agreement to falsify incriminating evidence, such as directing the contents of the Store employees' affidavits, "this could constitute a violation" of Plaintiffs' Fourteenth Amendment due process rights. *Riley v. City of Montgomery, Ala.*, 104 F.3d 1247, 1253 (11th Cir. 1997) (citations omitted); *see also Holmes v. Kucynda*, 321 F.3d 1069, 1083–84 (11th Cir. 2003) (holding that the officer was not entitled to qualified immunity where he submitted a warrant application that included deliberately false statements about the incidents leading to the plaintiff's arrest, and there was no evidence of probable cause other than the facts manufactured or falsified by him).

Clairizier testified that Officer Toledo was with her when she wrote her affidavit, and he told her what to write, including that Plaintiffs forced their way into the Store — despite his knowledge that Clairizier believed this was false. (*See* Clairizier Dep. 38:24–42:13; *see also* Pls.'

Facts ¶ 59).  Montes also testified that she thought Officer Toledo was the one who told her what to write in her affidavit.  (Montes Dep. 34:17–19 (alteration added); *see also* Pls.' Facts ¶ 60).  Assuming a jury credits Clairizier's and Montes's testimony, Officer Toledo would have instructed both employees to write that Plaintiffs forced their way into the Store, despite having already received the exculpatory evidence.  (*See* Clairizier Dep. 53:24–54:14).  Plaintiffs further claim that Officer Grontenhuis notarized Clairizier's affidavit, and Officer Rillo notarized Montes's affidavit — despite both of them knowing that the affidavits contained material misrepresentations regarding probable cause.  (*See* Pls.' Facts ¶¶ 59–60).  If these facts are believed, a jury could find the Officers attempted to fabricate evidence to prosecute Plaintiffs, which would violate their Fourteenth Amendment due process rights.

Additionally, if a jury were to find the Officers reached an agreement to cover-up Officer Toledo's use of force, that would establish a violation of Alcius's Fourteenth Amendment due process rights.  *See Hadley*, 526 F.3d at 1332 ("Covering up the use of excessive force may hinder a criminal defendant's access to the courts to redress a constitutional violation . . . [o]r, the cover-up may prevent exculpatory or impeaching evidence from reaching the desk of the state prosecutor[.]" (alterations added; citations omitted)).  According to Clairizier, Officer Toledo, while watching the Store Surveillance Video, insisted to the other Officers that Alcius hit him.  (*See* Clairizier Dep. 23:2–4).  Clairizier also claims Officer Toledo told her to write on her affidavit that Alcius "bumped the officer . . . on purpose" — even though she knew that was untrue.  (*Id.* 46:12–17 (alteration added)).

Florestal also testified that he heard Officer Rillo agree to write on the report that Alcius "dropped his shoulder into [Officer] Toledo."  (Pls.' Facts ¶ 58 (alteration added; citations omitted)).  And Officer McGuire's affidavit repeats the allegedly fabricated claim that Alcius

"intentionally lowered his right shoulder" into Officer Toledo.  (McGuire Aff. ¶ 30 (alteration added)).   These facts, if credited by a jury, could support Plaintiffs' claim that Defendants conspired to cover up the use of excessive force.

In sum, a jury could find that Defendants conspired to fabricate incriminating evidence and cover up Officer Toledo's use of force.  If Defendants fabricated incriminating evidence to justify the subsequent prosecution of Plaintiffs, such a conspiracy would have violated Plaintiffs' Fourteenth Amendment rights.

### b. Clearly-Established Law

At the time of the parties' encounter, it was clearly established that fabrication of evidence to secure a prosecution would violate Plaintiffs' clearly-established due process rights under the Fourteenth Amendment. *See Hadley*, 526 F.3d at 1332.  At the time of the encounter, it was clearly established that falsification of evidence to effectuate a prosecution, if true, would violate Plaintiffs' due process rights to a fair trial. *See Riley*, 104 F.3d at 1253 (citing *Schneider v. Estelle*, 552 F.2d 593, 595 (5th Cir. 1977)).

Finally, at the time of the alleged conspiracy, it was unconstitutional, under clearly-established law, for Defendants to cover up the use of excessive force.  Again, covering up the use of excessive force may hinder a criminal defendant's clearly-established rights to "access [ ] courts to redress a constitutional violation" or prevent exculpatory evidence from "reaching the desk of the state prosecutor[.]"  *Hadley*, 526 F.3d at 1332 (alteration added; citations omitted).

### 2. Intracorporate Conspiracy Doctrine

Defendants insist that even if Plaintiffs' conspiracy claims have merit, they are barred by the intracorporate conspiracy doctrine.[24]   (*See* Mot. 11).   Plaintiffs argue (1) the criminal

---

[24] "The intracorporate conspiracy doctrine holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy."

conspiracy exception to the doctrine applies, and (2) the doctrine is an affirmative defense that Defendants did not raise in their pleading and therefore waived. (*See* Resp. 10–11). Regardless of whether the intracorporate conspiracy doctrine applies[25] or there is an applicable exception,[26] it fails because Defendants did not timely raise the defense.

Plaintiffs argue the intracorporate conspiracy doctrine cannot bar the conspiracy claims, because the doctrine is an affirmative defense that Defendants failed to assert in their pleading. (*See* Resp. 10–11). Under Federal Rule of Civil Procedure 8(c), defendants are required to "affirmatively state any avoidance or affirmative defense" in their pleading. Fed. R. Civ. P. 8(c)(1). Failure to plead an affirmative defense generally results in a waiver of that defense. *See Keybank N.A. v. Hamrick*, 576 F. App'x 884, 888 (11th Cir. 2014).

Defendants argue the intracorporate conspiracy doctrine is not an affirmative defense, and thus they were not required to raise the doctrine in their pleading. (*See* Reply 6). The Court is not convinced — certainly, others courts regularly treat the doctrine as an affirmative defense. *See,*

---

*McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000). "[U]nder the doctrine, a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." *Id.* (alteration added). "The doctrine applies to public entities such as [cities] and [their] personnel." *Denney v. City of Albany*, 247 F.3d 1172, 1190 (11th Cir. 2001) (alterations added; citations omitted); *see also Rehberg v. Paulk*, 611 F.3d 828, 854 (11th Cir. 2010) (intracorporate conspiracy doctrine barred section 1983 conspiracy claim against a county employee).

[25] To determine whether the intracorporate conspiracy doctrine applies, courts ask whether the "only alleged conspirators are government employees who were acting within the scope of their official duties." *Nassar v. Fla. Dep't of Agric.*, 754 F. App'x 903, 907 (11th Cir. 2018) (citation omitted). All Defendants are law enforcement officers with the City of Hollywood Police Department. (*See* Am. Compl. ¶¶ 7–14). "The subject[s] of the alleged conspiracies" — the arrest, charging, and prosecution of Plaintiffs — "involve[] job-related functions well within Defendants' scope of employment as police officers." *Grider*, 618 F.3d at 1261 (alteration added). As a result, the intracorporate conspiracy doctrine would apply.

[26] Plaintiffs contend that an exception to the doctrine exists because "the conspiracy alleged is also a federal crime" under 18 U.S.C. section 242. (Resp. 11–13). This argument misinterprets the exception. The exception is for "convictions involving criminal charges of conspiracy." *Dickerson*, 200 F.3d at 769 (citations omitted). The Officers here have not been convicted of criminal conspiracy. Consequently, the criminal conspiracy exception does not apply.

*e.g.*, *Diamond Resorts U.S. Collection Dev., LLC v. Miller*, No. 6:20-cv-1668, 2022 WL 452480, at *12 (M.D. Fla. Jan. 11, 2022), *report and recommendation adopted in part*, No. 6:20-cv-1668, 2022 WL 4585106 (M.D. Fla. Feb. 1, 2022); *Bluegreen Vacations Unlimited, Inc. v. Timeshare Termination Team, LLC*, No. 20-cv-25318, 2021 WL 2476488, at *6 (S.D. Fla. June 17, 2021); *Plain Bay Sales, LLC v. Gallaher*, No. 9:18-cv-80581, 2020 WL 5808070, at *3 (S.D. Fla. Sept. 30, 2020); *Orange Lake Country Club, Inc. v. Reed Hein & Assocs., LLC*, No. 6:17-cv-1542, 2019 WL 7423517, at *19 (M.D. Fla. Oct. 4, 2019); *Petricevic v. Shin*, No. 20-cv-00283, 2021 WL 2700382, at *4 (D. Haw. June 30, 2021), *motion to certify appeal denied*, No. 20-cv-00283, 2021 WL 3669302 (D. Haw. Aug. 18, 2021) (justifying the court's consideration of "the intracorporate conspiracy doctrine" as "an affirmative defense" (citation and quotation marks omitted)); *Phillips v. Baxter*, 768 F. App'x 555, 558 (7th Cir. 2019) (acknowledging intracorporate conspiracy doctrine as an affirmative defense).

Because the doctrine is an affirmative defense that was not alleged in the Answer, it is untimely. Nevertheless, Defendants may rely on an untimely affirmative defense unless Plaintiffs demonstrate that the belated notice of the defense prejudiced them in some way. *See Pensacola Motor Sales Inc. v. E. Shore Toyota, LLC*, 684 F.3d 1211, 1222 (11th Cir. 2012). Plaintiffs demonstrate that prejudice here.

Prejudice requires Plaintiffs to demonstrate that Defendants' belated, "surprise" assertion prevented them from discovering different evidence or developing a different theory of the case over the course of the litigation. *Pinares v. United Techs. Corp.*, 10-cv-80883, 2018 WL 10502427, at *3 n.6 (S.D. Fla. Dec. 6, 2018) (quoting *Jones v. Miles*, 656 F.2d 103,107 n.7 (5th Cir. 1981)); *see also Cooper v. Marten Transp., Ltd.*, No. 1:10-cv-3044, 2014 WL 11517830, at *5 (N.D. Ga. May 23, 2014) (allowing affirmative defense when the plaintiff "did not explain what

different or supplemental line of questions he would have pursued had he known of [d]efendants' effort to proceed with [the affirmative] defense" (alterations added)).  Courts have determined that a plaintiff cannot claim prejudice when there is "no claim of surprise[,]" *Jones*, 656 F.2d at 108 (alteration added), such as when the affirmative defense was raised in a "motion for summary judgment only 36 days after [the] first pleading[,]" *Sweet v. Sec'y, Dep't of Corr.*, 467 F.3d 1311, 1322 n.4 (11th Cir. 2006) (alterations added).

Plaintiffs' genuine surprise, and resulting prejudice, are plainly evidenced here by their initial response to the Motion.  When Defendants first raised the affirmative defense — seven months after filing their Answer — Plaintiffs attempted to amend their Amended Complaint to add the City of Hollywood as a defendant and remove the conspiracy claims.  (*See generally* Pls.' Mot. for Leave to File an Am. Compl. & Modify Scheduling Order [ECF No. 64]).  The Court denied the requested amendment as untimely.  (*See generally* Jan. 5, 2023 Order [ECF No. 65]).  If Defendants had raised the affirmative defense at the appropriate time, earlier in the litigation, Plaintiffs could have amended their Complaint to assert the proper claims against the proper defendants.  This inability to "change litigation strategy" is the exact prejudice which the untimely assertion of an affirmative defense should not cause.  *Pinares*, 2018 WL 10502427, at *3.

Simply put, Defendants waited too long to put Plaintiffs on notice regarding the affirmative defense.  *See Britt Green Trucking, Inc. v. FedEx Nat., LTL, Inc.*, No. 8:09-cv-445, 2014 WL 3417569, at *13 (M.D. Fla. July 14, 2014) (the defendants waited years to raise an affirmative defense in their summary judgment motion); *Kleiman v. Wright*, No. 18-cv-80176, 2020 WL 5632654, at *32 (S.D. Fla. Sept. 21, 2020) (concluding that plaintiff suffered prejudice because affirmative defense was raised at the "eleventh hour after two years of extensive discovery" (quotation marks and citation omitted)).  Plaintiffs' inability to properly adjust and litigate their

case is sufficiently prejudicial for the Court to not allow the untimely assertion of the defense. Accordingly, Plaintiffs' Fourteenth Amendment conspiracy claim survives.

### 3.  Conspiracy Claims Against Officer Kalish

Plaintiffs advise "[t]he parties have agreed to file a stipulation of dismissal, to dismiss Defendant Bryan Kalish and Defendant Paul Scheel." (Resp. 1 (alteration added)).  On February 8, 2023, Plaintiffs filed a Stipulation of Dismissal with Prejudice as to Scheel [ECF No.75] but not as to Kalish.  Instead, they filed a Notice on the Status of Dismissal as to Kalish [ECF No. 76].

After Plaintiffs filed their Response, Plaintiffs took the deposition of Albert Cooper, a lieutenant in the City of Hollywood Police Department, and Lieutenant Cooper provided information that "materially changed the Plaintiffs [sic] former position regarding dismissing Bryan Kalish." (Notice on the Status of Dismissal 1–2).  Despite this, the Court concludes summary judgment is warranted on the conspiracy claims against Officer Kalish.  The Court need not consider the unidentified supplemental information Plaintiffs discovered, since they did not submit the information in compliance with the Local Rules.  *See* S.D. Fla. Loc. R. 7.1.  Moreover, Plaintiffs' Notice does not specify what "material information" Plaintiffs learned.  (Notice on Status of Dismissal 2).

Consequently, there are no facts in the summary judgment record to support a finding that Officer Kalish conspired with the other Officers to violate Plaintiffs' constitutional rights.

### IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Defendants' Motion for Summary Judgment **[ECF No. 57]** is **GRANTED in part** and **DENIED in part**.  Defendants' Motion is **DENIED** with respect to **Counts II and IV**.  Summary judgment is **GRANTED** in favor of all Defendants as to

CASE NO. 22-60386-CIV-ALTONAGA/Strauss

**Count I**, Defendant Kalish as to **Count II**, Defendant Toledo as to **Count III**, and Defendant Grontenhuis as to **Count V**.

By May 17, 2023, the parties shall submit a scheduling report with suggested dates for calendar call and the two-week trial period, to take place no later than August 2023.

**DONE AND ORDERED** in Miami, Florida, this 10th day of May, 2023.

_____
**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:     counsel of record